Wallace *v.* Greenlaw.

J. M. WALLACE *v.* J. E. GREENLAW, Ex'r, *et al.*

SUBROGATION. *Endorsers.* T and G were first and second endorsers for W. Judgment was recovered against G. T furnished G $7,000, to aid in paying the judgment. G paid the balance. Prior to the judgment the debtor by deed of trust conveyed property to G to secure him as said endorser and to secure other indebtedness to G. *Held*, that T was not entitled to share in proceeds of trust property until the indebtednes of W to G had been satisfied in full. The doctrine of subrogation in favor of creditor or co-security does not apply. The first endorser was liable for full amount of the judgment, and was not entitled upon the sum he had paid to share *pro rata* in the trust property with G, but only entitled to whatever sum might remain after payment in full of the indebtedness of W to G.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

CRAFT & COOPER and CLAPP & BEARD for complainants.

R. J. MORGAN, W. MESSICK, HARRIS & TURLEY, JARNIGAN & FRAYSER and HUMES & POSTON for defendants.

McFARLAND, J., delivered the opinion of the court.

The controversy brought up by this appeal has arisen between W. A. Williamson and W. C. McClure, receiver of the Bank of Memphis, both claiming rights

growing out of the administration of the estate of W. B. Greenlaw, deceased, which was being administered in this case as an insolvent estate. The parties have chosen, without objection, to treat the matters in dispute as properly presented for adjudication by the petitions and answers filed by them as creditors of said estate, and we therefore make no question as to the propriety of this mode of proceeding. The facts upon which the questions arise are as follows:

W. B. Waldran was indebted to Wade H. Bolton by note for a balance of some $17,500, which had been endorsed by Sam. Tate and W. B. Greenlaw for the accommodation of Waldran—Tate being first and Greenlaw second endorser. Greenlaw demanded security of Waldran, and on the 8th of April, 1869, the latter conveyed to W. Messick, trustee, property in Memphis, known as the "Waldran Block," first, to secure Greenlaw in another indebtedness of about $4,169.22, money which he had paid for Waldran on a debt known as the Tharpe note, and next to secure Greenlaw on account of his aforesaid endorsement of the Bolton note, with the usual power of sale and directing how to appropriate the proceeds. The trust deed conveyed other property which, however, by consent of the parties in interest, was afterwards released.

Subsequently, the executor of Bolton sued Greenlaw upon his endorsement of the note referred to, and obtained judgment for the balance due, with interest. Greenlaw being pressed for the payment of this judgment, applied to Tate, the first endorser of the note, for assistance, and received from Tate seven thousand

Wallace *v.* Greenlaw.

dollars, and executed and delivered to him the following paper, to-wit:

"Memphis, Tenn., Dec. 10, 1872.

Received of Sam. Tate seven thousand dollars, to aid me in paying a judgment against me on account of my endorsement of W. B. Waldran's note, first endorsed by said Tate; said judgment is in favor of E. M. Apperson, executor of Wade H. Bolton, for which I hold a deed of trust from Waldran on what is known as the "Waldran Block," which deed of trust is a first lien on said property. I agree to prosecute said trust deed to collection as soon as possible, and when collected to pay the said Tate, or order, the seven thousand dollars now advanced me, with interest."

Signed,        W. B. Greenlaw."

Soon thereafter, Greenlaw, with the money thus furnished and with other money of his own, paid said judgment to Apperson, executor, in full.

W. A. Williamson subsequently became the owner, by assignment, of Greenlaw's claims against Waldran (which included other debts besides those mentioned) and to the benefit of the security of said deed of trust in the following manner; Waldran, it seems, had filed a bill against Greenlaw for the purpose of setting up defenses to the debts claimed by Greenlaw, and to enjoin the execution of said deed of trust. The cause was heard in the chancery court and a decree rendered in favor of Greenlaw for some $18,000, from which Greenlaw appealed. Pending the appeal, in 1874, Greenlaw assigned all his rights in this suit to Williamson to secure a pre-existing indebtedness, and agreed

to prosecute this appeal for his benefit. Greenlaw died, and the cause was revived in the name of his executor for the use of Williamson, and prosecuted to a decree against Waldran for upwards of $31,000, the injunction was dissolved, and the trustee directed to proceed under the trust deed to sell the property.

When Tate received from Greenlaw the receipt for the $7,000 of the 10th of December, 1872, or soon after, he placed it in the hands of M. J. Wicks, to secure him as Tate's endorser of a note to the Bank of Memphis; subsequently, about April, 1878, by agreement, McClure, the receiver of the Bank of Memphis, accepted said receipt in satisfaction of said note. So, it is not denied that McClure is entitled to Tate's rights under said receipt. It is assumed that the property embraced in the deed of trust, the "Waldran Block," will not sell for enough to pay all the indebtedness secured by it, and hence the question arises, upon whom the loss shall fall. It is insisted upon behalf of McClure, that by virtue of the transaction of the 10th of December, 1872, and the paper of that date, Greenlaw became bound to pay Tate $7,000 and interest out of the proceeds of said property, and this by the force of said transaction and contract gave to Tate a prior right to that extent under the deed of trust, and that McClure, standing in Tate's shoes, is entitled to the same right. Among other positions taken in behalf of Williamson, it is insisted that both he and McClure stand in the attitude of equitable assignees of Greenlaw, and that under the rule in this State, Williamson has first perfected his right by giving

notice to the trustee, Messick, and the debtor Waldran; and that no such notice was given to the trustee of the assignment of the $7,000 receipt by Tate; and further, that by superior diligence upon the part of Williamson, and laches upon the part of the claimants of the $7,000 receipt, the former has acquired the superior equity. Without, however, disposing of these questions, we will treat the case as if it were a contest between Greenlaw and Tate themselves over the proceeds of the trust property, leaving out of view the questions above referred to as to the effect of the assignments. In this view the case turns upon the effect of the transaction of the 10th of December, 1872, between Greenlaw and Tate, and the paper that day executed. Did this give to Tate a prior right of satisfaction out of the proceeds of the trust property to the extent of the $7,000 and interest?

It may readily be conceded, as argued on behalf of McClure, that the legal effect of the deed of trust made by Waldran was to secure the payment of the *debt to the creditor*, so far as the property conveyed proved sufficient, and that the deed is not to operate merely for the personal benefit of Greenlaw. The creditor would have been entitled to the benefit of the security, and if the proceeds had at his instance been appropriated directly to the debt it would, of course, thereby have enured to the indemnity of all others secondarily bound upon the paper; so that any indemnity obtained by one surety enures to the benefit not only of the creditor, but also of a co-surety, or it may be of any one secondarily liable. And it may

further be conceded, that where the debt has been paid to the creditor by the sureties, any indemnity held by either surety would enure to the benefit of the others who paid any part of the debt; and further, that where the indemnity proves insufficient to reimburse the sureties the amounts paid by them, they will share the indemnity *pari passu*. That is to say, if Greenlaw and Tate had been *co-sureties* of Waldran, and the proceeds of the property conveyed by the deed of trust proved insufficient to reimburse them in full, then they would share the proceeds *pari passu*, not-withstanding the fact that the deed of trust was made at the instance of Greenlaw, and upon its face purports to be for his benefit: See *Jones* v. *Hamlet*, 2 Sneed, 256; *Kennedy* v. *Pitts*, 2 Sneed, 91; 6 Hum., 313.

This must result from the relative rights of the sureties as between themselves, for a surety has the right to compel a co-surety to share the loss with him equally, and to effect this, any indemnity obtained from the principal debtor must be shared equally. To this extent the doctrine of subrogation contended for may be conceded. But it will be borne in mind, that Greenlaw and Tate were not *co sureties*. Tate being first endorser, was liable to Greenlaw for any sum the latter may have been compelled to pay, unless otherwise indemnified. As between the two, Tate was liable for the whole debt—as to Greenlaw, he stood in the attitude of principal debtor. It is true there is nothing in the pleadings or proof as to whether Tate's liability had been fixed by notice or otherwise; as already said, the pleadings are altogether informal.

But we think it apparent that Tate's liability was conceded by him, and the transaction of the 10th of December, 1872, was had in reference thereto. Waldran, the principal debtor, in his deposition says, the reason that Greenlaw called on Tate for assistance in paying off the judgment was, because Tate was first endorser; he says Tate was hard pressed for money, and talked freely to witness about it, but witness was in no condition to help. He says Tate did not loan Greenlaw the $7,000, but on the contrary it was his distinct understanding that it was because Tate was first endorser that Greenlaw demanded his assistance; besides, this fact sufficiently appears from the face of the receipt. So that, assuming that at the date of this transaction, Tate's liability as first endorser upon the note was admitted, and the $7,000 advanced by Tate in recognition of this liability, then what right did he acquire by the payment to be subrogated or substituted to Greenlaw's rights under the deed of trust? He undoubtedly acquired a right; that is to say, if the property proved sufficient to pay the whole debt, Tate will be reimbursed the amount advanced by him, or he will be entitled to all that remains after paying Greenlaw what he may be entitled to. We think it clear that by the payment Tate did not acquire a right to priority over Greenlaw, or even to share with him the proceeds of the trust property equally.

As we have seen, Tate was first liable for the whole debt; by recognizing his liability and meeting it to the extent of the $7,000, he did not change the rela-

tive rights of himself and Greenlaw, or deprive the latter of any rights he previously had, either against Tate or under the deed of trust. It cannot be that Greenlaw's rights were any less after receiving this payment from Tate than before. This is, of course, upon the assumption which we have already made, that Tate advanced the money in recognition of his liability as first endorser. Of course it would have been different if Greenlaw had simply borrowed the money from Tate, or in consideration of the money had assigned him so much of the proceeds of the deed of trust. Our conclusion, therefore, is that by reason of the payment alone, Tate acquired a right to be reimbursed out of the proceeds of the trust property only after Greenlaw was satisfied in full. It does not change this conclusion that Greenlaw has lost by the statute of limitations all right of action against Tate as his prior endorser. This does not relieve Tate of all liability to Greenlaw for any sum the latter or his assignee may fail to realize out of the deed of trust, but to the extent of the $7,000. Tate having paid it, it becomes simply a question as to his right to be reimbursed. We hold that he cannot recover it from Greenlaw or to his prejudice, unless he can do so by virtue of the express contract of Greenlaw, which is the remaining question to be considered.

It is very earnestly argued, that whatever may have been Tate's rights by virtue alone of the payment of the money, still Greenlaw, by the express terms of his written contract, bound himself absolutely to pay Tate the $7,000, and interest, out of the proceeds of the

trust property. We do not deem it necessary to review the authorities referred to, to show that it is. perfectly competent for parties occupying the relation of co-sureties or successive endorsers, to fix between themselves their respective rights and liabilities by agreement. The proposition may be conceded, and further, that such agreement may be made after the liability has accrued, and that their rights and liabilities as fixed by the agreement will be enforced by the courts, even though the rights and liabilities thus fixed by their agreement be different from their rights under the law. We need not stop to enquire whether this proposition is subject to limitations or exceptions, but for the argument concede it to the full extent. The question then is, what is the proper construction of the paper of the 10th of December, 1872? Did Greenlaw undertake absolutely to pay to Tate, out of the proceeds of the trust property, $7,000, and interest, or transfer to him that much as a prior claim? Did he intend to change the relative rights of Tate and himself under the deed?

Greenlaw, by this paper, acknowledges that he had received from Tate $7,000, to *aid* him (Greenlaw) in paying the judgment against him on account of his endorsement of the Waldran note, first endorsed by Tate, and promises to prosecute the deed to collection, and out of the proceeds, when collected, pay to Tate, or order, the $7,000, and interest. But it must be borne in mind that the property was then regarded as worth largely more than all the debts secured by the deed—the "Waldran Block" then being worth, ac-

cording to the proof, $40,000. So, in making this promise, Greenlaw assumed that there would be no loss to either of them. The contingency of a deficit was not contemplated. Construing this paper in the light of the surrounding circumstances, we hold that it was not intended as an undertaking upon the part of Greenlaw to pay Tate the $7,000, and interest, as a prior claim out of the proceeds of the trust property, or as a guaranty that the property should pay all the debts. The promise of Greenlaw only meant that he would, out of the proceeds of the trust property, repay Tate according to his legal rights. So we hold, that in case the property fails to sell for a sum sufficient to pay all the debts, Greenlaw or his assignee is entitled to priority, both as to the debt called the Tharpe debt, which is in terms given priority in the deed, and also as to the money advanced by Greenlaw to pay the Bolton debt. McClure, as assignee of Tate, will only be entitled to the surplus. We are unable to see the grounds upon which the doctrine of estoppel can aid McClure. The decree of the chancellor having been otherwise, must be reversed.

It has been argued that a debt of $2,000, held by Greenlaw's estate against Tate, should be set off against any claim upon the $7,000 receipt in favor of Tate or his assignee; but as was correctly held by the chancellor, the claim founded upon the $7,000 receipt is against Waldran and the trust property, and the $2,000 is due Greenlaw's estate, and these claims are, therefore, not subject to be set off.

As above indicated, the decree will be reversed, and the costs of this court paid out of the sale of the trust property.